# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

KYLE J. RODNEY,

                  Petitioner,

    v.

TIM GARRETT,[1] *et al.*,

                  Respondents.

Case No. 3:13-cv-00323-RCJ-VPC

**ORDER**

This matter is before the Court on remand from the United States Court of Appeals for the Ninth Circuit (ECF No. 57) for consideration whether Petitioner Kyle J. Rodney can overcome the procedural default of his ineffective-assistance-of-trial-counsel ("IAC") claims alleged in his *pro se* amended petition for writ of habeas corpus brought under 28 U.S.C. § 2254 (ECF No. 102) ("Petition"). For the reasons discussed below, the Court finds Rodney has failed to overcome the procedural default of his IAC claims. Accordingly, the IAC claims will be dismissed, and the petition will be denied. The Court will, however, issue a certificate of appealability.

## I.    FACTUAL BACKGROUND[2]

### A.    Ralph Monko hit the jackpot.

Ralph Monko testified that in the early morning hours of October 29, 2009, he won about $9900 from a slot machine at the Hard Rock Hotel & Casino (Hard Rock).[3] (ECF No. 15-5 at 12,

---

[1] According to the state corrections department's inmate locator page, Rodney is incarcerated at Lovelock Correctional Center. The department's website reflects Tim Garrett is the warden for that facility. *See* Lovelock Correctional Center Facility | Nevada Department of Corrections (nv.gov). The Court will therefore direct the Clerk of the Court to substitute Tim Garrett for Respondent Timothy Filson, under, *inter alia,* Fed. R. Civ. P. 25(d).

[2] The Court here and elsewhere in this order summarizes the relevant state court record for consideration of the issues. The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by the Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked the evidence in considering the claims.

[3] Henderson Police Department crime scene analyst Jessica Royal testified she photographed a gaming receipt for $9000, dated October 29, 2009, found in a pair of blue jeans at Monko's home. (ECF No. 15-10 at 30.)

14–15, 18, 22, 41–42.) While awaiting delivery of his winnings, Rodney sat down next to Monko, introduced himself as "Patrick," and asked how much Monko won. (*Id.* at 23–25, 36, 41–42.) During their conversation, Rodney expressed interest in a job with Monko's company, and Monko gave him his cell phone number. (*Id.*) Rodney asked Monko if he wanted to "go out and party," and he could get him "girls," "drugs," or "whatever," but Monko told him "No." (*Id.*) After Rodney left, Monko received his winnings and proceeded to win an additional $1500 playing three-card poker. (*Id.* at 18, 25–27.) Thereafter, Monko collected his Corvette from the valet, stashed about $10,000 in a chamois behind the passenger seat, and headed toward home.[4] (*Id.* at 28–29.)

On the way, Monko received a phone call from Rodney, and they agreed to meet at a Sinclair gas station ("the Sinclair") so Monko could purchase marijuana. (ECF No. 15-6 at 4–7.) Rodney arrived at the Sinclair in a silver Dodge Ram pickup with the same girl who had accompanied him at Hard Rock. (*Id.* at 8–10.) Rodney suggested to Monko that they move their cars to the other side of the Sinclair because police were visible in the area. (*Id.* at 13.) After they moved the cars, a second man, Craig Downing, entered Monko's Corvette, and told Monko he wanted to go to another parking lot, but Monko told Downing, "Well, let's just go to my house. It's down the street."[5] (*Id.* at 14–15.) Monko testified that he did not tell police about the marijuana or that he invited Rodney and Downing to his home because he had never been in trouble, thought they would arrest him, and everybody would tell him he was "crazy." (*Id.* at 16–19.) Monko also admitted he "skirted around" the issue of his buying marijuana during his testimony at the preliminary hearing because he was embarrassed and his children were present, but said he decided to "come forward with what happened about the marijuana." (*Id.*)

**B.    Monko was robbed and severely beaten at his home.**

Monko testified they drove to his house, he parked the Corvette in his garage, and was standing next to his car when Rodney and Downing walked up to his garage. (ECF No. 15-6 at

---

[4] Monko identified Rodney (and the woman who accompanied Rodney (Tanya)) in surveillance video and still photographs from the Hard Rock video showing their interactions (including Rodney entering Monko's telephone number into his cell phone), and the movements of Rodney and the woman. (ECF Nos. 15-5 at 35–51; 15-6 at 2–3.)

[5] Monko identified surveillance video from the Sinclair depicting the events he testified about, including Rodney, Tanya, and Downing. (ECF No. 15-6 at 11–12, 19–29.)

29–34.) Monko said he told them "Let's go inside" and he "probably took two steps" when they hit him "in the back of the head with the baseball [b]at" and he "went down" on his "knees." (*Id.* at 35–36.) He said they "just started beating" him, and he started to crawl and turned to swing at one of them but was hit in the neck area with the bat, which he described as the kind of bat used to hit fish. (*Id.* at 37.) Monko said they hit him with the bat and another hard object and Rodney was "hitting" and "kicking" him. (*Id.* at 37–38.) Monko did not recall which man held the bat, but surmised Rodney had the bat because Monko was hit on the side where Rodney was located. (*Id.* at 38–39.) He said one of them "grabbed" him "by the back of the hair" and said, "something like," "'You're dead now. You're dead now. We're killing you. You're dead now'" and when Monko looked up, he saw a "big and heavy" knife coming toward his "left eye." (*Id.* at 41–43, 48–49.) Monko said he ducked down but "there was so much force" that his "orbital bone" was "cracked," and he felt the knife slice so "deep that it went all the way to the skull," "cut to the bone" and "cut all the nerves." (*Id.* at 41–42, 50.) Monko did not recall which assailant held the knife. (ECF No. 15-7 at 47–48.) He said both Rodney and Downing hit him with "something," the beating "didn't stop" after he was cut with the knife, and the last thing he remembered before losing consciousness was the bat hitting him "across the nose." (*Id.* at 2–3, 48–49.) Monko also testified he identified Rodney and Downing in photographic lineup arrays as the men who attacked him. (*Id.* at 21–24.)

### C. Ashley Womack drove Rodney to Monko's house and witnessed the beating.

Ashley Womack testified she was at Scott Ishol's house the night of Monko's beating, and that after receiving a call from Tanya, she and Downing took Ishol's truck, picked up Rodney and Tanya, and headed to Hard Rock. (ECF Nos. 15-11 at 50–51; 15-12 at 2–10.) She said Tanya specifically asked her to bring Downing with her, that they were going to pick up a friend, that they were partying with friends, and that one of them won "nine grand." (ECF No. 15-12 at 5–8.) En route to Hard Rock, Rodney had a telephone conversation and told Womack to drive them to the Sinclair instead. (*Id.* at 10–12.) Womack said Rodney and Tanya told her they were delivering "cocaine," but she did not see them with cocaine or marijuana. (*Id.* at 13–16.)

Womack said she backed the pickup truck next to a Corvette at the Sinclair, and Rodney, Downing, and the man in the Corvette, talked, but she said they "didn't want to do an exchange

because they think that the guy is [sic] a cop." (*Id.* at 16–17.) She said Downing got into the Corvette and she heard either Rodney or Downing say there was no money in the Corvette. (*Id.* at 18.) Womack said Monko told them to follow him, and she didn't know why, but they drove to Monko's house, he pulled the Corvette into the garage, and she parked across the street. (*Id.* at 18–19.) She said the truck window was open "a little bit" and she saw Rodney and Downing enter Monko's garage while she and Tanya stayed in the truck. (*Id.* at 19–21.)

Womack saw Monko gesture toward Downing "as if to say, 'come on inside'" and when Monko turned around, Downing pulled a bat out of his sleeve and "started to hit him" with it. (*Id.* at 22–23.) Womack said the bat belonged to her, she did not know Downing had it, and that he later "tossed it out of the truck." (*Id.* at 23–24, 32.) She said it appeared to her that Rodney and Downing were working together, Downing hit Monko "a few" times, and she never saw Rodney tell Downing to stop. (*Id.* at 23–24, 37.) Womack said she "turned away" because it "bothered" her and she was "a little bit" scared, and although she did not watch the entire event, she saw Monko fall down after a few hits. (*Id.* at 24–25, 36.) Womack said she did not hear mention of a robbery, never saw a knife, never saw Rodney strike Monko, and never saw Rodney with a weapon in his hand; however, she saw Rodney lean over Monko and it appeared as though he went through Monko's pockets, but she could only see Monko's feet, did not see Rodney's hands, and had no idea whether Rodney did anything to Monko when she had her head turned away from them. (ECF Nos. 15-12 at 27, 41, 43; 15-13 at 2–3, 8.)

Womack testified she heard Downing yell to Rodney "'[D]id you get it,'" and Rodney "either said, 'Yeah,' or something," but she said Downing "must not have heard" Rodney because Downing "kept hitting" Monko until Rodney "ran up back into the garage" and told Downing either, "'Come on. Let's go,'" or "'Stop. Let's go. I got it.'" (ECF No. 15-12 at 25, 47.) She said the entire episode lasted "maybe ten minutes." (ECF No. 15-13 at 3–4.) She said they left Monko unconscious and lying on his back in front of his car, and that it "ran" through her mind that he was more than unconscious. (ECF No. 15-12 at 37.) She later heard "shuffling" of money from the backseat of the truck where Rodney and Downing were seated, saw Rodney with Monko's cell phone and keys, and saw Downing with the money and Monko's cell phone. (*Id.* at 29–33, 48.)

Henderson Police Department ("HPD") Detective Michael Condradovich testified Womack contacted him about the robbery and he did not make any promises to her on behalf of the prosecution. (ECF No. 15-13 at 52–54.) According to Condradovich, Womack initially told him she drove to the Sinclair but not to Monko's residence, but after he explained the difference between a witness to a crime and a participant in a crime, she told him about the incident at Monko's residence. (ECF No. 15-14 at 2.) The detective agreed Womack told him she did not see Rodney with a weapon, did not see him hit Monko, and did not hear Rodney and Downing talk about anything beforehand, and that she had no reason to believe Rodney knew it was anything other than a simple robbery. (*Id.* at 5–7.) The detective agreed Womack told him, "Hey, [Rodney], did not hit the dude. [Rodney] didn't hit the dude. He just took his phone, keys, and money." (ECF No. 15-15 at 35.) The detective was aware Womack had traffic warrants for failing to pay a traffic ticket fine and that she was arrested on those warrants. (*Id.* at 24–25.) Womack testified neither the prosecutors nor Detective Condradovich made promises in exchange for her testimony, and although Detective Condradovich knew she "had warrants," and she was told she could "go down to the district attorney and that they would help" with placing her matter "back on calendar and resetting her payment plans," no one "squashed" her warrants and she "went to jail and had to squash them that way." (ECF Nos. 15-12 at 35–36, 49; 15-13 at 7–8.) She said she testified of her own free will. (ECF No. 15-13 at 8.)

The defense called Rodney's brother, Joseph Lee Bray, who testified Rodney was at home asleep at the time of the attack on Monko. (ECF Nos. 15-15 at 51; 15-16 at 3–4.)

**D.     Monko was taken to a trauma center for his injuries.**

Monko testified he awoke in his garage, it was daylight, and his Corvette was still there. (ECF No. 15-7 at 4.) His phone, keys, wallet, and cash in his pocket, were gone. (*Id.* at 4–5.) He grabbed his face, and his "finger went underneath" his skin "right to the bone." (*Id.* at 6.) He went to the bathroom inside the house by the side of the garage, saw his face, felt blood dripping on his neck, felt his head, and "freaked out." (*Id.* at 5–6.) He poured rubbing "alcohol" on the cut on his head, which he said hurt "unbelievably" and applied "duct tape or strapping tape" to stop the bleeding. (*Id.*) He tried to walk upstairs to get to a phone to call for help, but lost consciousness in

the second stairwell. (*Id.* at 7–8.) When he awoke, he went to his bedroom, but his cordless phone battery had lost its charge, so he put it in the cradle, and lost consciousness a third time. (*Id.*) When he awoke, his head was "really bleeding bad" so he "shaved" it and applied tape and Vaseline, but he "just couldn't stop bleeding" and became "weaker and weaker." (*Id.* at 9.) He emailed Melissa Carroll to call him at home, and when she called, he told her "Get here now. Emergency," before his phone battery died, and then went inside his bathroom, and "was out again." (*Id.* at 9–11.)

Melissa Carroll[6] testified she arrived at Monko's house sometime after 4:00 p.m. and found him on his bathroom floor bleeding onto a pillow. (ECF No. 15-8 at 6–10.) She said "[h]is eyes were completely black and swollen shut, and he had cuts on his head, and . . . he shaved [the middle part of] his head."[7] (*Id.* at 10–12.) She saw Monko shivering, and she was "afraid he was going to die," so she called 9-1-1. (*Id.* at 14–15, 19.)

City of Henderson firefighter and paramedic trainee George Downey testified he responded to Monko's home sometime between 5:00 and 7:00 p.m. (*Id.* at 21–24.) He said they found Monko lying down in the upstairs bathroom and that Monko was not "initially" fully oriented but responded to questions. (*Id.* at 25–26.) Downey said Monko had "several lacerations about his head and several bruises and contusions on the side of his torso." (*Id.*) He explained that "[a] laceration is a cut usually caused by a sharp object like a knife or a scalpel" and "[a] contusion would be like a bruise as if they were hit by a blunt object." (*Id.* at 26–27.) He said Monko had applied tape to the top and back of his head to stop the bleeding, but it "pretty much was still open." (*Id.* at 29–30.) Downey said that although there was "a lot of blood on his head," in the history of his profession, there was "what we would call a small amount of blood" and not "a gross amount." (*Id.*) Downey said Monko had "bruising around his eyes," i.e., "racoon eyes," and contusions on his body. (*Id.* at 28–29.) Downey said Monko was taken by ambulance, to Sunrise Hospital because

---

[6] Carroll admitted she was previously convicted of a felony in California in 1995 or 1996, but said it was reduced to a misdemeanor and had nothing to do with this case. (ECF No. 15-8 at 19, 21–22.)

[7] Carroll identified State's Exhibits 13, 14, 15, 16, and 17, as photographs that accurately represent Monko's condition when she saw him in the bathroom, and they were admitted into evidence. (ECF No. 15-8 at 11.)

"[h]is injuries fit the criteria for Trauma Center" which "required a potentially higher level of care than the closest hospital would provide." (*Id.* at 24, 29.)

HPD crime scene technician Kami Beckwith testified she photographed Monko in the trauma unit at Sunrise Hospital at around 8:20 p.m. after Detective Condradovich finished interviewing him.[8] (ECF No. 15-10 at 12–16.) She identified photographs she took of Monko that included one of "the top of his head" that depicted a "jagged cut that went down to the top of his eyebrow" that still had "a little bit of bleeding." (*Id.* at 14–19.) She identified a photograph she took of a "cut that goes down to his left eye from the top of his forehead" that was also bleeding "a little bit." (*Id.* at 19–20.) She also photographed "two areas" where Monko's head "was cut in the back." (*Id.*) He complained to her about pain in his left torso, so she photographed that area, but she said it did not depict any bruises or cuts at that time. (*Id.*)

Dennis Reilly, Jr., testified he was a friend of Monko's for 20 years and came out from Michigan to see him seven to ten days after the attack. (ECF No. 15-8 at 32–33, 39–40.) He said Monko recently had his stitches removed and his eyes "were still black and blue." (*Id.* at 40–41.) Reilly said Monko had a wound in the front of his head that was "four, five inches" long from his eyebrow over his forehead and other injuries on the back of his head that "kind of looked like stars" with "gaps as big as a half-inch that were stapled." (*Id.*) He said they "couldn't get all the skin back together," "so he had like open wounds of probably half-inch on the back of his head." (*Id.*) He said Monko experienced "several seizures" and "passed out a couple of times" in his presence, and they were "seizures like, you know, actually shaking to where we were, you know, we were close to calling 9-1-1 at that point," where Monko was "thirty, forty second[s] out and came back around and didn't know where he was." (*Id.*) Reilly said that, in his observation, Monko's short-term memory was a "third of what it used to be." (*Id.*) He said Monko was "referred by the advocate for the victim of violent crimes to a place in L.A." for hair restoration and therefore some of Monko's hair is not natural. (*Id.* at 41–42.)

///

---

[8] Beckwith identified State's exhibits 19, 20, 21 as photographs she took of Monko and the photographs were admitted into evidence. (ECF No. 15-10 at 17–21.)

**E.     Investigation Before Womack Contacted Police**

Detective Condradovich testified[9] he went to Monko's residence for about an hour after Monko was transported to the hospital, then went to the hospital to speak with Monko, and returned to the scene "for the processing of the house." (ECF Nos. 15-13 at 10–15; 15-14 at 10–11.) The detective said dispatch informed him Monko left the hospital "at the same time" the detective left Monko's residence, which was around 9:30 or 10:00 p.m. (ECF No. 15-14 at 11–12.)

Condradovich testified Monko "was pretty beat up," "one eye was completely swollen shut," the other eye was "swollen so he could barely open it," and he "had a large laceration that went down the front of his scalp with several other lacerations around the back of his head." (ECF No. 15-13 at 14.) Condradovich said there were inconsistencies in Monko's statements to police, i.e., Monko initially said he left Hard Rock at 4:30 a.m., and the suspects followed him home; however, the surveillance video showed the suspects left Hard Rock at around 2:45 a.m. and did not return, so the suspects could not have followed him home; and phone records show Monko communicated with Rodney before they met at the gas station. (ECF No. 15-14 at 15–16.)

Condradovich obtained surveillance video from Hard Rock and the Sinclair. (ECF No. 15-13 at 16–18.) Condradovich said the Hard Rock video depicted Rodney and Tanya "paying attention" to Monko after he won at the slot machine by moving closer to Monko and turning their seats so they could see him, and also by walking to the upper level of the casino and sitting down "at a slot machine that looks directly down the aisle" where Monko was gambling. (*Id.* at 18–21.) He said the Hard Rock video depicts Rodney tapping Monko on the shoulder, sitting next to Monko, engaging in conversation, and at one point holding a cell phone "all lit up." (*Id.* at 21–22.) Condradovich said the Sinclair video depicted Rodney wearing clothes similar to those he wore at Hard Rock. (*Id.* at 17–18, 21–22.)

///

---

[9] The trial transcript states an incorrect oath was given to Detective Condradovich. (ECF No. 15-13 at 11.) Under Nevada law, "[b]efore testifying, every witness shall be required to declare that he or she will testify truthfully, by oath or affirmation administered in a form calculated to awaken his or her conscience and impress his or her mind with the duty to do so." NRS § 50.035(1). As neither party has asserted this as error, and Detective Condradovich, as lead detective, had to be aware he was bound to tell the truth and would be subject to punishment if he did not, the Court considers the oath fulfilled and any objection waived.

The detective obtained Monko's cell phone records and discovered one call from Monko's cell phone, made during the time he was on the way home from Hard Rock, to a pre-paid phone subscribed to "Bob" at an address in North Las Vegas. (*Id.* at 23–28.) The detective obtained the records for the pre-paid phone number, which showed six calls to Monko's cell phone during the same time period. (*Id.* at 28–29.) Monko told the detective he did not recognize the individuals associated with the North Las Vegas address for the pre-paid phone subscription. (*Id.* at 30–35.) Condradovich, however, discovered Rodney was associated with the address next door to the address for the prepaid telephone subscriber, and through additional research, he identified Rodney as residing at Ishol's residence.[10] (*Id.* at 35–37.) The detective went to Ishol's address and "saw a gray Dodge Ram truck in the driveway" with "a chrome toolbox in the back of the bed that matched the truck that was on video at the gas station." (*Id.*) The detective confirmed Rodney, along with Tanya, Womack, and Downing, had stayed at Ishol's address. (*Id.*) Ishol gave the detective Rodney's cell phone number and "it was the exact same number that shows up" as "Bob's" number on Monko's phone records for the night of the attack. (*Id.* at 38–39.) The detective also confirmed the birthdate for "Bob" was the same as Rodney's birthdate. (*Id.*) Monko identified Rodney in a photographic lineup array as the man who introduced himself as "Patrick." (*Id.* at 39–41.) Condradovich spoke with Rodney, who admitted he was at Hard Rock and saw Monko win, but denied contact with Monko, meeting Monko after the fact, and having a cell phone. (*Id.* at 46.) The detective testified Ishol's pickup truck was searched about two and a half weeks after the incident, and police found two knives, but neither the knives nor the truck had blood on it. (ECF No. 15-15 at 37–38.)

The detective said that "a week or two after the incident," Monko left him a message stating he was readmitted to the hospital, and when the detective reached him, Monko described the second assailant as a man in his "early thirties" with "dark skin" of a "mixed race" with short hair and "a really mean look on his face." (ECF No. 15-13 at 41–42.) The detective said that description

---

[10] Scott Ishol testified he owned a Dodge Ram pick-up truck with a wide cab, that Womack dated Downing, Tanya dated Rodney, Rodney was introduced to him as Rick Jimenez, and they all lived at Ishol's residence in October 2009. (ECF No. 15-11 at 36–43.)

sounded "a lot like Mr. Downing," so he prepared a lineup array that included Downing's photograph and Monko identified Downing as "the other guy that attacked" him. (*Id.* at 42–45.)

## II.    PROCEDURAL BACKGROUND

### A.    State Court and Initial Federal Habeas Proceedings

The jury convicted Rodney of (1) conspiracy to commit murder, (2) conspiracy to commit robbery, (3) attempted murder with use of a deadly weapon, (4) burglary while in possession of a deadly weapon, (5) robbery with use of a deadly weapon; and (6) battery with use of a deadly weapon resulting in substantial bodily harm. (ECF No. 16-4.) Rodney appealed the sufficiency of the evidence to support his convictions for attempted murder with a deadly weapon and conspiracy to commit murder, but the Supreme Court of Nevada affirmed the convictions. (ECF No. 17-5.)

Rodney filed an initial *pro se* state petition for writ of habeas corpus and request for appointment of counsel, but the request for counsel was denied. (ECF Nos. 17-8; 17-9; 17-10; 17-17 at 4.) In his initial petition, Rodney claimed, among other things, that trial counsel was ineffective in failing "to object to the perjured testimony of Monko" and failing to present "any expert witnesses with regard to evidence of Monko's wounds . . . ." (ECF No. 17-8 at 12.) On appeal from the denial of the petition, the Supreme Court of Nevada rejected Rodney's IAC claims.[11] Rodney filed a second *pro se* state collateral review petition for writ of habeas corpus,

---

[11] The Supreme Court of Nevada held:

[A]ppellant claimed that trial counsel was ineffective for failing to object to the victim's perjured testimony. Appellant's claim is belied by the record, as trial counsel did object and moved to strike the victim's testimony. Furthermore, counsel cross-examined the victim thoroughly about the discrepancies in the victim's testimony at the preliminary hearing and at trial. Any inconsistencies or improbabilities in the testimony went to the weight of the testimony and not the admissibility of the testimony; it was for the jury to determine the weight and credibility of the witnesses and testimony presented. *McNair v. State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992). Thus, the district court did not err in denying this claim.

[A]ppellant claimed that trial counsel was ineffective for failing to present expert witness testimony as to fingerprints, blood, or the victim's wounds. Appellant failed to demonstrate that counsel was deficient or that he was prejudiced because appellate failed to support this claim with specific facts that, if true, entitled him to relief. *See Hargrove v. State*, 100 Nev. 498, 502, 686 P.2d 222, 225 (1984). Appellant did not identify any expert witnesses who would have testified, nor did appellant explain what testimony the experts would have provided at trial. Therefore, the district court did not err in denying this claim.

(ECF No. 17-21 at 3–4.)

and a corresponding request for appointment of counsel; however, the request for counsel was denied and the petition was dismissed as procedurally barred under state law. (ECF Nos. 17-23; 17-24; 18-2, 18-8.) Rodney appealed and, while that appeal was pending, Rodney filed a federal habeas action. (ECF No. 1.) The Supreme Court of Nevada affirmed the dismissal of Rodney's second state collateral review petition, and this Court permitted Rodney to file an amended petition in his federal habeas proceedings. (ECF Nos. 30-3; 32; 102.) On Respondents' motion to dismiss the Petition, the Court dismissed Grounds 2–6 and 9 as procedurally defaulted and dismissed Ground 10 as duplicative of Grounds 3 and 9. (ECF No. 41.) The Court determined Grounds 7–8, and 11–14 are unexhausted and Rodney abandoned those claims. (ECF Nos. 41; 45.) The Court denied relief for the remaining Ground 1, declined to issue a certificate of appealability, and entered judgment on the merits. (ECF Nos. 49; 50.) Rodney appealed the Court's order denying the petition and the United States Court of Appeals for the Ninth Circuit granted a certificate of appealability for the issue: "[W]hether the district court erred in finding that the claims regarding ineffective assistance of trial counsel were procedurally defaulted." (ECF No. 55.)

**B.**     **The Remand Order of the United States Court of Appeals**

On March 1, 2019, a panel of the United States Court of Appeals for the Ninth Circuit issued an opinion vacating the Court's final order denying habeas relief and remanding the case for additional proceedings. *Rodney v. Filson*, 916 F.3d 1254 (9th Cir. 2019). The Circuit determined the Court erred by not conducting an analysis of the substantiality of Rodney's IAC claims pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). *Id.* at 1259–60. The Circuit stated:

> The severity of Monko's injuries was potentially relevant to elements of several of the charges of which Rodney was convicted. The district court record contains excerpts of Monko's medical records; however, in arguing whether there is a reasonable probability that the jury's verdict would have been different if not for counsel's alleged deficiencies, both parties refer extensively to additional medical records that were not before the district court.

*Id.* at 1261. The Circuit determined the Court's current record "is insufficiently developed for [that court] to be able to conclusively evaluate the substantiality of Rodney's IAC claims." *Id.* Accordingly, the Circuit stated that, to further develop the record, "the district court may allow discovery upon a showing of good cause under Rule 6 of the Rules Governing § 2254 Cases in the

United States District Courts, may hold an evidentiary hearing as warranted, and may consider Monko's medical records and any other evidence relevant to the issue of the substantiality of Rodney's IAC claims." *Id.* at 1262. Consistent with then-existing precedent, the Circuit held that § 2254(e)(2) does not bar the district court from holding an evidentiary hearing, because a petitioner seeking to show cause based on a lack of post-conviction counsel is "not asserting a 'claim' for relief as that term is used in § 2254(e)(2)," and provided the following directive:

> On remand, the district court "may take evidence to the extent necessary to determine whether [Rodney's] claim[s] of ineffective assistance of trial counsel [are] substantial under *Martinez*." *Dickens* [*v. Ryan*], 740 F.3d [1302][,] 1321 [(9th Cir. 2014) (en banc)]. Although review under 28 U.S.C. § 2254(d)(1) is limited to the state court record, that evidentiary limitation—and § 2254(d) itself—"applies only to claims previously 'adjudicated on the merits in State court proceedings.'" *Dickens*, 740 F.3d at 1320 (quoting 28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011)). Furthermore, § 2254(e)(2) does not bar the district court from holding an evidentiary hearing, because a petitioner seeking to show cause based on a lack of post-conviction counsel is "not asserting a 'claim' for relief as that term is used in § 2254(e)(2)." *Dickens*, 740 F.3d at 1321. Accordingly, the district court may allow discovery upon a showing of good cause under Rule 6 of the Rules Governing § 2254 Cases in the United States District Courts, may hold an evidentiary hearing as warranted, and may consider Monko's medical records and any other evidence relevant to the issue of the substantiality of Rodney's IAC claims. If the district court determines that Rodney's IAC claims are substantial and thus that the procedural default of the claims is excused under *Martinez*, then AEDPA deference will no longer apply and the claims will be subject to de novo review. *Dickens*, 740 F.3d at 1321.

*Id.* at 1261–62.

To comply with the remand order, the Court invited the parties to submit motions relevant to and in furtherance of the remand proceedings. (ECF No. 63.) The Court granted Rodney's motion for discovery. (ECF No. 73.) The Court ordered Rodney to notify the Court when discovery was complete so the Court could issue a briefing schedule on the question of cause and prejudice under *Martinez* and the underlying merits of Rodney's remaining IAC claims. (*Id.*) The Court denied Rodney's motion for an evidentiary hearing without prejudice reasoning that the briefing would assist the Court in narrowing factual issues, if any, that may require an evidentiary hearing. (ECF Nos. 66; 68; 73 at 2, 5.)

Upon completion of discovery, the Court set a briefing schedule on the issues. (ECF Nos. 77 at 2; 78.) On October 26, 2021, Rodney filed an opening brief on the substantiality and merits of his remaining IAC claims. (ECF No. 80.) In support of his claims and request for an evidentiary

hearing, Rodney submitted (1) an Initial Analysis Report by Michelle Woodfall, MS RN, Clinical Nurse Specialist with Godoy Medical Forensics Inc. (ECF No. 68-1), (2) the Declaration of trial counsel, Robert Glennen III (ECF No. 81-1), and (3) Monko's Sunrise Hospital & Medical Center Records. (ECF Nos. 83-1). On February 28, 2022, Respondents filed an answering brief. (ECF No. 88.) In support of the answer, Respondents submitted (1) 12-pages of the medical records of Monko produced by the Clark County District Attorney to Rodney (ECF No. 90-1), (2) Photographs taken at Monko's initial emergency room hospital visit and admitted at trial as State's Exhibit 13, 19, 20, and 21 (ECF No. 90-2), and (3) the complete 358 pages of Monko's medical records from Sunrise Hospital Medical Center, that Rodney provided to Respondents (ECF No. 90-3). On August 22, 2022, Rodney filed a reply brief. (ECF No. 97.)

## III.   LEGAL STANDARDS

### A.   Standards for Evaluating Effective-Assistance-of-Counsel

A petitioner claiming ineffective assistance of counsel must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy either question, the Court need not consider the other. *Id.* at 697.

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). In considering an IAC claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. On the performance prong, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. *Id.* at 689–90. A petitioner making an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* In considering such claims, a court is obligated to

"determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* On the other hand, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. It is a petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687. To establish prejudice, it is not enough for the petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

**B.    Standards for Evaluating Defaulted Effective-Assistance-of-Counsel Claims**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "A federal habeas court generally may consider a state prisoner's claim only if he has first presented that claim to the state court in accordance with state procedures." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1727 (2022). Where a petitioner has failed to do so and therefore "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," federal habeas review "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

To demonstrate cause for a procedural default, a petitioner "must establish that some external and objective factor impeded his efforts to comply with the state's procedural rule." *Hiivala v. Wood*, 195 F.3d 1098, 1105 (9th Cir. 1999) (citing *Murray v. Carrier,* 477 U.S. 478, 488 (1986)). "[T]o establish prejudice, [a petitioner] must show not merely a substantial federal claim, such that 'the errors . . . at trial created a possibility of prejudice,' but rather that the constitutional violation 'worked to his actual and substantial disadvantage.'" *Shinn*, 142 S. Ct. at

1734–35 (emphasis in original) (citing *Carrier*, 477 U.S. at 494 and quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).

The Supreme Court has held that a petitioner may overcome "the cause" requirements for purposes of overcoming a procedural default for an ineffective assistance of trial counsel claim:

> [W]here (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 14, 18 and relying on *Coleman*, 501 U.S. 722).[12]

An ineffective-assistance-of-trial-counsel claim "is insubstantial" if it lacks merit or is "wholly without factual support." *Martinez*, 566 U.S. at 14–16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). In *Martinez*, the Supreme Court cited the standard for issuing a certificate of appealability as an analogous standard for determining whether a claim is substantial. *Id.* According to the certificate of appealability standard, a claim is substantial if a petitioner shows "reasonable jurists could debate whether . . . the [issue] should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. This standard does not require a showing that the claim will succeed, but instead only that its proper disposition could be debated among reasonable jurists. *See generally Miller-El*, 537 U.S. at 336–38.

## IV.   DISCUSSION

The parties agree the only issue to be addressed for purposes of determining whether Rodney has overcome the procedural default of his IAC claims is whether the claims are "substantial" under *Martinez*. (ECF Nos. 80 at 14; 88 at 15); *see also Rodney*, 916 F.3d at 1260. The determination whether Rodney can demonstrate his IAC claims are substantial for purposes

---

[12] Nevada requires prisoners to raise IAC claims for the first time in a state petition seeking postconviction review, which is the initial collateral review proceeding for purposes of applying the *Martinez* rule. *See Rodney*, 916 F.3d at 1259–60.

of overcoming the procedural default of those claims is made *de novo*. *See Visciotti v. Martel*, 862 F.3d 749, 768–69 (9th Cir. 2017). If he does so, the IAC claims are reviewed *de novo* on the merits. *See e.g.*, *Rodney*, 916 F.3d at 1258 (citing *Dickens*, 740 F.3d at 1321); *see also Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

### A.   The Court may not consider evidence beyond the state court record or conduct an evidentiary hearing.

Before addressing whether Rodney's IAC claims are substantial for purposes of overcoming the procedural default of those claims under *Martinez*, the Court must first determine whether it may consider any of the exhibits submitted by the parties in these proceedings and under whether it may conduct an evidentiary hearing.

In May of 2022, the Supreme Court decided in *Shinn* that "a federal habeas court may not conduct an evidentiary hearing *or otherwise consider evidence beyond the state-court record* based on ineffective assistance of state postconviction counsel" unless the exceptions set forth in 28 U.S.C. § 2254(e)(2) are satisfied. *Shinn*, 142 S. Ct. at 1734, 1738 (emphasis added) ("[W]hen a federal habeas court . . . admits or reviews new evidence for any purpose, it may not consider that evidence on the merits of a negligent prisoner's defaulted claim unless the exceptions in § 2254(e)(2) are satisfied."); *see also Shoop v. Twyford*, 142 S. Ct. 2037, 2043–44, 2046 (2022). The requirements of § 2254(e)(2) are as follows:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—
>
> (A) the claim relies on—
>
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

///

16

In *Shinn*, the Supreme Court considered the cases of two state prisoners (Ramirez and Jones) in which the district courts considered evidence, that had not been developed in the state court records due to the alleged ineffective assistance of postconviction counsel, for purposes of holding that Ramirez and Jones overcame the procedural defaults of their IAC claims under *Martinez. Shinn*, 142 S. Ct. at 1728–30. In Ramirez's case, the district court used the new evidence to also deny the IAC claim on the merits, while in Jones's case the new evidence was also used to hold that trial counsel had provided ineffective assistance. *Id.* The United States Court of Appeals for the Ninth Circuit reversed Ramirez's case for further factfinding on the merits of the IAC claim and denied rehearing. *Id.* at 1729. In Jones's case, the Circuit affirmed and denied rehearing. *Id.* at 1730. The Supreme Court reversed both cases holding the district courts erred because "[u]nder § 2254(e)(2), a prisoner is 'at fault' even when state postconviction counsel is negligent" and "[i]n such a case, a federal court may order an evidentiary hearing *or otherwise expand the state-court record* only if the prisoner can satisfy § 2254(e)(2)'s stringent requirements." *Id.* at 1735, 1740 (emphasis added). The Supreme Court explained that, although it has the power to establish the narrow exception for establishing cause and prejudice to overcome the procedural default of a trial counsel IAC claim as set forth in *Martinez*, it has "no power to redefine when a prisoner 'has failed to develop the factual basis for a claim in State court proceedings'" due to the existence of the requirements of § 2254(e)(2). *Id.* at 1736–38. The Supreme Court in *Shinn* rejected the proposition that an evidentiary hearing may be conducted under § 2254(e)(2) based on the theory that a petitioner seeking to show cause is "not asserting a 'claim' for relief as that term is used in § 2254(e)(2)." *Id.*

Rodney claims *Shinn* does not restrict the Court's ability to entertain evidence that he failed to develop in the state court proceedings because, unlike the petitioners in *Shinn*, he did not have the assistance of state postconviction counsel for his state collateral review proceedings. (ECF No. at 97 at 13–15.) The Supreme Court has rejected that argument. The Supreme Court interpreted § 2254(e)'s use of the word "fail" "to mean that the prisoner must be 'at fault' for the undeveloped record in state court," and that a "a prisoner is 'at fault' if he 'bears responsibility for the failure'" to develop the record. *Shinn*, 142 S. Ct. at 1733–34. The Supreme Court held that, "under AEDPA

and [the Supreme Court's] precedents, state postconviction counsel's ineffective assistance in developing the state-court record is attributed to the prisoner." *Id.* Thus, regardless of whether a petitioner is personally "at fault" for failing to develop the state court record or failed to develop the record due to ineffective assistance of postconviction counsel, it is inherent in *Shinn*'s holding that a federal habeas petitioner must meet the requirements of § 2254(e)(2) for a federal habeas court to consider facts that were not developed in the state court record or to conduct an evidentiary hearing.[13] For these reasons, Rodney must meet the requirements of § 2254(e)(2) in order for the Court to consider facts he failed to develop during the state court proceedings and in order for the Court to conduct an evidentiary hearing. *See Shinn*, 142 S. Ct. at 1733–39 (relying on *Holland v. Jackson*, 542 U.S. 649, 653 (2004) and *Williams v. Taylor*, 529 U.S. 362, 433 (2000)).

The Court finds Rodney cannot meet the requirement of § 2254(e)(2)(A)(ii) because he has failed to show his claims rely on "a factual predicate that could not have been previously discovered through the exercise of due diligence." The Supreme Court has explained that this provision "pertains to cases in which the facts could not have been discovered, whether there was diligence or not." *Williams,* 529 U.S. at 435. Here, there is no indication that during his initial state court proceedings, Rodney could not obtain, through the exercise of reasonable diligence, the (1) Initial Analysis Report by Michelle Woodfall, MS RN, Clinical Nurse Specialist with Godoy Medical Forensics Inc. (ECF No. 68-1); (2) the Declaration of trial counsel Robert Glennen III (ECF No. 81-1); and (3) Sunrise Hospital & Medical Center Records that are not included in the State's Proposed Trial Exhibit 73 (ECF Nos. 83-1; 90-3). Thus, the Court may not consider those documents or conduct an evidentiary hearing. Accordingly, the requests to consider the aforementioned documents and request for an evidentiary hearing are denied.

## B.    Additional Background Based on the State Court Record

In determining whether Rodney can establish substantial IAC claims under *Martinez*, the Court will consider the state court record, including, (1) excerpts from Monko's medical records

---

[13] Rodney's argument that he is entitled to present evidence at an evidentiary hearing also fails because the plain language of 2254(e)(2), expressly states that its restrictions on evidentiary hearings apply to "applicants" for a writ of federal habeas corpus who failed to develop the factual basis of a claim in State court proceedings.

from Sunrise Hospital marked as State's proposed trial exhibit 73, which were forwarded to the Supreme Court of Nevada as part of the state court record during the appeal from the denial of the initial postconviction review petition[14] (ECF No. 18-19); and (2) photographs of Monko taken at Sunrise Hospital that were admitted as State's trial exhibits 3, 19, 20, and 21 (ECF No. 90-2).

### 1.    Sunrise Hospital Records

The State's proposed trial exhibit 73[15] purports to be a Physician Clinical Report for Dr. James E. Fenner at Sunrise Hospital Medical Center Emergency Department dated October 29, 2009. (ECF No. 18-19.) The report indicates Monko arrived as early as 6:31 p.m., was first seen at 6:56 p.m., was at the hospital until sometime after 11:40 p.m., and that Dr. Fenner signed the report electronically at approximately 12:20 a.m. (*Id.*) The report states the clinical impressions included (1) physical assault; (2) concussion with loss of consciousness; (3) multiple deep lacerations to scalp and face with delayed treatment; (4) contusion to the chest; and (5) multiple facial fractures, including one to the left frontal sinus. (*Id.* at 5.) The report states Monko exhibited "battle's sign," "racoon eyes," and bilateral "fractures of the nasal bones" that extended "through the frontal sinus, anterior and posterior walls, causing intracranial air and orbital emphysema on the left," and a "fracture through the right lamina papyracea" that created "orbital emphysema on the right." (*Id.* at 3.) The report indicates Monko exhibited "no numbness," "mild swelling," no "sensory deficit," and "moderate tenderness" on the left side of his face. (*Id.*) The report indicates "no deformity consistent with a depressed skull fracture" but noted a "deep laceration of the middle and lower central left side of the forehead" extending 9.5 centimeters to periosteum and frontal sinus" that is "jagged and irregular." (*Id.*) His right eye had a "small subconjunctival hemorrhage," and his left eye had a "medium sized subconjunctival hemorrhage." (*Id.*)

The medical report dictates that at 10:30 p.m., Monko received 29 sutures for a 9.5-centimeter "complex" laceration to his head that required "revision of wound margins." (*Id.*) At

---

[14] The Court takes judicial notice of the online docket of the Supreme Court of Nevada for Case No. 60206, which contains a record on appeal that includes the State's Proposed Exhibit 73 (Document Number 12-19081 at 1259–63): 60206: Case View (nvsupremecourt.us).

[15] The Court makes no finding whether or not State's Exhibit 73 would have been admissible, in whole or in part, during the state court trial, and summarizes it only for consideration of the substantiality of the IAC claims.

10:55 p.m., he received 10 sutures for a 5-centimeter laceration of intermediate complexity. (*Id.*) At 11:10 p.m., he received 4 sutures for a 4.5-centimeter laceration of intermediate complexity. (*Id.*) At 11:20 p.m., he received 5 sutures for another 5-centimeter laceration of intermediate complexity. (*Id.*) Finally, at 11:30 p.m., he received 6 sutures for a 6-centimeter laceration of intermediate complexity. (*Id.* at 3–4.) The neurosurgeon recommended antibiotics and a follow-up the next week. (*Id.* at 5.) The on-call trauma surgeon indicated Monko could be discharged with a follow up the following week with the trauma office and an ENT physician. (*Id.*) Monko was instructed to apply ice, elevate the affected areas, not to blow his nose, not to work, and that an observer must check on him frequently for 24 hours to confirm he was "not confused, has no new weakness or numbness, and has no other problems." (*Id.* at 5–6.) The doctors prescribed Cephalexin and Percocet. (*Id.* at 6.)

### 2.    Monko's Preliminary Hearing Testimony about his Injuries

At the preliminary hearing a few months after the attack, Monko testified Rodney hit him on the back of the head with a "silver" bat. (ECF No. 14-7 at 5.) Monko said he went down on his "knee" and Downing sliced him with a "big knife," approximately 12-inches long that "cut part of [his] eye socket out, cut all the nerves that go through" and resulted in his loss of "taste or smell." (*Id.* at 5–6.) Monko said that after Downing "slashed" him, he was hit again on the back of the head and fell on his side. (*Id.*) He said they hit him "on the other side when [he] looked up" and "they put [his] nose into [his] brain." (*Id.*) He said "[t]hat's what almost killed me" and that he lost consciousness. (*Id.*) Monko described his injuries on direct examination as follows:

Q. Let's talk about the injuries you sustained. You already spoke about this whole fracture?

A. Right.

Q. How many stitches were used to stitch your forehead back up to your scalp?

A. I don't know. A lot. I think it was a hundred on the inside and another hundred on the outside.

Q. Now, were there also injuries to the back of your head that needed stitching?

A. Hundreds.

Q. So you had hundreds of stitches in your head, correct?

A. Right.

Q. Now, you have a scar that we already talked about that's on the left side of your forehead that goes from basically your hairline into your left eye?

A. Right.

Q. And you have a chipped bone of your orbital bone?

A. Right

Q. Now, because of the lacerations to your skull, you lost hair, correct?

A. Oh, yeah.

Q. And have you had a surgery so that they could sew a hairline back into your scalp?

A. I have.

Q. And you testified to your loss of smell and taste?

A. They're gone.

Q. You have no smell and no taste?

A. Zero.

Q. Which obviously you had before this incident?

A. Oh, yeah.

Q. Let's talk about your memory. Do you have problems?

A. It's getting better all the time.

Q. But before, did you?

A. Yes.

Q. Are those long term memory problems, short term?

A. Short term.

Q. What about headaches?

A. Unbelievably bad for a long time. Real bad. They had me sedated for quite awhile because of that.

Q. Seizures?

A. The brain swelled up so bad that it was pressing against the skull and that's when they thought they were going to have to cut the skull opened. [sic] But the injuries in the back of the head where they caved it in and they pulled the skull back up, that's where the headaches were and they just said it's going to take a long, long

time for the brain swelling to go down.

Q. And have you seen a neurosurgeon?

A. Oh, yeah.

Q. How many surgeries have you had?

A. I had the surgery in the hospital. The one that I had first is when they took—when they pulled the bone out of the brain cavity. And the back [sic] was just basically restructuring the bone in place and sewing it up.

Q. Do you have seizures?

A. Yes.

Q. Dizziness?

A. Yes.

Q. Vertigo?

A. Uh-huh.

Q. And what about feeling, do you have feeling in your face?

A. This part from the left side of the scar over to this part there's absolutely no feeling. This is all numb from the skull to the eyebrow, no feeling.

Q. How many days did you spend in the hospital?

A. I was in there 36 hours and then I kept saying I wanted to get out, I wanted to get out, I wanted to get out. And so when they released me when [sic] the doctors found out, the neurosurgeon and the other doctor, they put me right back in.

Q. How many days did you spend then?

A. Then I spent about six days then and then they released me again, but I had to be under 24-hour care. That's when my children came in from out of state.

(*Id.* at 6–7.) On cross-examination by counsel for co-defendant Downing, Monko provided additional testimony concerning his injuries:

Q. You originally went to the hospital you said for 36 hours and then you were released?

A. Uh-huh.

Q. How long were you released for before [sic] you were readmitted?

A. I can't give you an exact time.

Q. Would it have been more than a day?

A. Yes.

Q. More than a week?

A. No. I don't believe so. It was all real fuzzy back then. That's when I was in bad, bad shape. Bad shape. Bad shape.

Q. When you say you were readmitted, you were there for six days; is that correct?

A. I believe it was something like that. And then I got readmitted again weeks and weeks later when the infection started.

Q. The last time you were readmitted for the infection do you recall how long you were in that time?

A. I was there from Monday to Friday I believe. Might have been Sunday to Thursday. It was a five day antibiotic and I had to stay with the IV[]s in the hospital. Because they were afraid if that infection would have broke through the cracks of the skull I would have died immediately.

Q. What were your symptoms do you recall before you were readmitted?

A. Of which part of the injury? The head, the eyes?

A. Were you suffering headaches?

A. Oh, yes.

Q. Were you suffering any vision problems?

A. No.

Q. Were you receiving any medication for your headaches?

A. I was.

Q. Sedatives?

A. I don't know. What do you mean?

Q. Do you know the name of the medication you were receiving for your headaches?

A. They started with—they gave me—I can't think of the name of it but I didn't like it and I said I wanted only Ibuprofen 800.

Q. Do you remember the date you would have made that change?

A. No.

Q. Would that have been prior to your being readmitted for the infection?

A. Yes.

Q. So the best of your knowledge the only pain medication that you were on when you were readmitted for the infection would have been Ibuprofen 800?

A. When I was in there for the infection they were giving me—for the pain they were shooting straight into the IV because the pain was just unbelievable because of the infection. The Ibuprofen wasn't working then, I don't know what they were giving me, but those were bad days. Those were really painful, bad days.

Q. Did the medication make you drowsy?

A. I don't think so.

(*Id.* at 12.)

### 3.     Relevant Pre-Trial Proceedings

The State agreed to provide Monko's Sunrise Hospital medical records to the defense. (ECF Nos. 14-9 at 3–4; 103-3 at 5.) On February 26, 2010, the State disclosed the names of expert witnesses, including nurses, physicians, and medical imaging specialists, at Sunrise Hospital, who would possibly testify about the nature and extent of Monko's injuries, the examination and results, the medical care needed to treat those injuries, and the methods and techniques of taking and developing radiographs for diagnostics and screening purposes performed for Monko. (ECF No. 14-13 at 3.) On March 16, 2010, Rodney's counsel had not yet received the medical records and stated he "would not be able to adequately represent" Rodney without them. (ECF No. 14-9 at 4.) On May 18, 2010, the State informed the state district court the defense had received the medical records and Rodney's counsel stated Rodney was willing to proceed without an expert. (*Id.* at 12.)

The next day, Rodney filed a notice of reliance on an alibi defense. (ECF No. 103-6.) On June 8, 2010, defense counsel announced Rodney was ready for trial. (ECF No. 14-9 at 15.) Just before commencement of the State's case in chief, Rodney informed the trial court that he was told the State would call Womack as a rebuttal witness and that he felt "left-winged by the State." (ECF No. 15-5 at 6–7.) The State indicated Womack was noticed as a witness a month before trial, and it intended to call her as a rebuttal witness to refute an alibi defense. (*Id.* at 10.)

### 4.     Monko's Trial Testimony about his Injuries

At trial, Monko testified on direct examination concerning his injuries:

Q. What were the injuries that you sustained because of this incident?

A. Obviously this. The scar.

Q. Above your—

A. Scar across my head. Post-traumatic syndrome . . . .

Q. And else [sic] about physical injuries?

A. I have no taste and no smell.

Q. To this day?

A. To this day. Gone. Completely. I can smell nothing. I can taste nothing. They told me with that that the sense are a really hard thing with the head injury and the cut.

The reason they said this is when they smashed my nose, the nose split and went into the two naval [sic] cavities and the sockets of your eyes, that could have caused a nasal injury. The . . . cut across my head was so deep that it cut every nerve and everything. I have no feeling on this side of my head at all. This right here; this is numb.

Q. The left side of your head?

A. Left side of—yeah. So they were hoping that—that that had to do with the taste and they says that, "Give it six months to nine months, and see if the nerve endings will find each other." They said it's quite common it does [sic]. And if it doesn't then obviously you're brain dead.

. . . .

Q. Do you have any sense of smell or taste?

A. No. I'm going to the University of Michigan to get the MRIs and for the neurologist, they believe now that it's brain dead; brain damage in the back of the head, and that's why I have no smell or taste.

Q. Okay. Let's talk about any other type of aftermath from this event. Any other type of physical pain or brain injury?

A. I had the water drained out of this knee four times already. They hit me with something on the knee.

. . . .

Q. Well, physically. Physically. Is it currently difficult for you to do things? Do you have problems doing things?

A. I have real bad short-term memory, and post-traumatic syndrome which is something you have to work through.

Q. Okay. Functionally, does your brain work like it used to?

A. I can't multi-task nowhere near like I used to.

Q. Do you have any type of dizziness?

A. [T]hat's gone away. A lot of that. It was really bad for a long time, but it's getting better.

. . . .

Q. And how much care—we're talking about right after you were released—how much care did you need on a daily basis?

A. Twenty-four hours

Q. Okay. How so?

A. Because I kept having these things—we call them, "episodes," but they were—I can't remember what they were—called them [sic], but I would be walking to the bathroom or somewhere and I would fall to the ground and start shaking. What's that?

      THE COURT: Seizure?

      THE WITNESS: Seizure. Thank you.

Q. And how often were you having those?

A. Quite often.

Q. [A]t what point did those stop?

A. They put me on seizure medicine which helped a little bit for a little while, but it went on for two and half months, I think.

Q. Are you currently on any medications?

A. No.

Q. What medications were you on after you sustained these injuries?

A. I don't know. There was [sic] like five of them.

. . . .

Q. Now, you talked about the fractures of your nose, and you also talked about the scar that's in the front of your head, and you talked about the injury to the back of your head. Did you have treatment for that as well?

A. Well, they basically could just sew it up is all they could do at the time, and then I had the MRIs done, and I didn't have them done at Sunrise. I wanted an independent person because I didn't feel that I was getting proper healthcare there at all, so I have a private guy do the MRI and we sent it to the neurologist, and I also took it to the Sunrise neurologist, but he . . . says, "If I can't operate, I don't really need to look at it," so that's when I went to my own and they said there was white spots but they says, "[Y]ou have to wait. We have to give this time."

Q. Okay. Were you ever admitted into Sunrise Hospital?

A. Yes. I was.

Q. And when was that?

A. [I]'m not sure how long; couple weeks.

Q. After . . . the initial stay?

A. Yes.

Q. And what was the reason you were readmitted?

A. From the injury, what happened was I got this infection and it stays with you for life.

. . . .

Q. You had an infection.

A. It's like Muruso or Marisa—

Q. Where was the infection located?

A. It started in the back of my neck. It was from the lowest injury they said and it was growing in the back of my neck and it got really bad and I went to see a private doctor, and as soon as he saw it, he shot me right to the hospital immediately. When I got in there, they took evasive . . . maneuvers. They said that infection—what they were afraid of that [sic] it was going to go up in my skull and in one of the cracks or the cuts and would go into my brain, and that would have been it.

Q. How long were you in the hospital for that time?

A. A week. About a week. And they had me on—then that's when they started reexamining my injuries and tell me that from the injury I got this from either the knife or one of the things they hit me with.

(ECF No. 15-7 at 15–21.) Defense counsel cross-examined Monko about his injuries:

Q. Now, you talked about that you have a loss of short-term memory.

A. Right.

Q. What does that entail?

A. Looking for my keys. I call it short—I don't really—maybe because I'm 54, but I—I'm trying to—like right now. Things I have to concentrate when I'm trying to remember a specific something.

Q. Now, does it lead to—are there holes in this—in your recollection of this evening?

A. What do you mean?

Q. Do you have things that you don't remember now or did you have things that you didn't remember until recently?

A. [A]fter the incident is when I had the most issues. But before the incident . . . I was all good. My head was clear.

Q. And you have given various—you've gone to the doctors pursuant to this injury how many times? Dozens?

A. No idea. Yeah. Many different doctors.

Q. Many times. Many doctors. And you told many of them that you were forgetful now? Can't concentrate anymore?

A. Depends on which doctor I was speaking with.

. . . .

Q. Do you remember what kind of prescriptions that you've been given after this incident?

A. No.

Q. Do you remember taking Percocet?

A. No.

Q. Do you remember not taking Percocet?

A. I don't think I ever took Percocet. I could be wrong unless they named it differently. But Percocet I don't think that was one of the prescriptions. It was an anx—

    THE COURT: Anxiety?

    THE WITNESS: Anxiety. And they also gave me pain pills and Ibuprofen.

Q. [D]o you remember any other pain pills? Vicodin, for example?

A. My son and daughter would know more. They were the ones who were giving me the medication.

Q. And Lortab. Do you remember any of those?

A. I don't know.

Q. Can you tell us what you take now?

A. Nothing.

Q. [D]o you remember telling the Court at the preliminary hearing that you only had Ibuprofen? That was the only pain medicine.

A. I don't remember, no.

. . . .

Q. That's on page 42 of the preliminary hearing. And sir?

A. Yes.

Q. You stayed at the hospital for three hours that night; is that about right?

A. Oh, no. It was longer than that. I'm not sure exactly.

. . . .

Q. Now, you reported to—which doctors did you report to when you were having seizures?

A. Every time I went to Sunrise, it was a different doctor. So I'm not sure.

Q. Would it be fair to say every doctor you talked to talked about the seizures?

A. I can't answer that. I don't know. I'm not sure. I just don't know.

Q. Now, the second time you were admitted it had to do with an infection?

A. Yes.

Q. [H]ow long did you stay in the hospital at that point?

A. Somewhere between five and seven days, I believe.

. . . .

Q. So it's fair to say that the medical records should show some reports that you were reporting seizures, and the medical report should show somewhere that—how long your first medical stay was?

A. Yes.

Q. Are you thinking it was like a day and a half? Do you remember saying—

A. I'm not going to comment if I don't know for sure. That'd be easy for you guys to find out.

(*Id.* at 38–43.) Monko additionally testified about his injuries and medical treatment on redirect examination:

Q. And when you got back into the hospital when you were readmitted, were you given pain meds at the hospital?

A. Yes.

Q. And were those given intravenously?

A. Yes.

Q. And how much pain were you [sic] at the hospital?

A. That was really bad.

Q. And this is when you were readmitted, correct, due to the infection?

A. Yes. That was bad.

(*Id.* at 46–47.)

1

### 5.    Proceedings During and After Monko's Trial Testimony

2      During the State's direct examination of Monko, defense counsel moved to strike Monko's

3  testimony as "inherently unbelievable" because Monko admitted he lied during the preliminary

4  hearing. (ECF No. 15-6 at 45–46.) The trial court denied the motion stating, "It's up to the jury to

5  decide what weight to give to anybody's testimony, what they think about somebody's creditability

6  [sic]." (*Id.*) The trial court suggested an instruction informing the jury "that if they think somebody

7  has misrepresented or lied about anything they can disregard their entire testimony or whatever

8  portions of it they may choose to find unbelievable . . . ."[16] (*Id.*) Defense counsel later moved to

9  strike Monko's testimony concerning his medical diagnoses that he suffered an infection and a

10  fractured skull because it constituted hearsay and Monko was unqualified to provide such

11  testimony:

12      [DEFENSE COUNSEL]: [W]e would move to strike the testimony of Mr. Monko
       concerning the medical diagnosis of his injuries. The opening statement had a
13      statement on the medical diagnosis being, "fractured skull, spine, other things,
       infections of various sorts." [T]hat opening statement and Mr. Monko's testimony
14      would certainly be admissible with a doctor testifying as to the medical diagnosis—

15      THE COURT: Did you object when Mr. Monko was testifying?

16      [DEFENSE COUNSEL]: I did not object when Mr. Monko was testifying.

17      THE COURT: I didn't think so. You kind of got to object to the testimony before I
       start to make a ruling as to whether it's going to be admissible or not. I mean, he
18      certainly knows what happened to him and he can describe what happened to him,
       and to the extent you're not going to object to him describing the diagnosis he
19      received and in the hospital and care and medications and all that, I can't really—I
       mean, I don't just jump in sua sponte and run somebody's case.
20
       [DEFENSE COUNSEL]: Corre[c]t, your Honor. Certainly he can testify, "How I
21      hurt. I could observe this. I have observed this many stitches["]; however, diagnosis
       would all be based on hearsay and based on expertise that he doesn't have.
22
       THE COURT: [W]hat particular diagnosis are you referring to that he testified
23      about? I mean, other than him saying, "I had a giant five-inch knife cut from my
       eyebrow up into my scalp, and then I had some other cuts on my scalp . . . and really
24      bad pain and headaches and bruises . . . and pain in my torso, and then I've lost my
       sense of smell. I've lost my sense of taste, and I went back in the hospital because
25      I had an infection . . . in the base of my skull.["]

26

27  _____

    [16] The trial court later instructed the jury "If you believe that a witness has lied about any material fact in the
28  case, you may disregard the entire testimony of that witness or any portion of his testimony which is not proved by
    other evidence." (ECF No. 15-21 at 45.)

. . . .

[DEFENSE COUNSEL]: And I say the infection being mersa would be a diagnosis by a doctor. The fractured skull would be a diagnosis rather than, "My skull had an indentation," and which he could observe.

THE COURT: Okay.

[DEFENSE COUNSEL]: And so I think those would be the only things.

THE COURT: Okay. State?

. . . .

[THE STATE]: Judge, well, first of all . . . it's an untimely objection. That was three days ago. Mr. Monko has been as you see on the stand to several—and his friend, Dennis Riley [sic], testified he's been to doctors and doctors and doctors. He's been to clinics. He currently has visited neurosurgeons. He's seen his X-rays. He knows where his fractures are. He can testify to the fact of his pain. The fact that he has recurring headaches. The fact that he can't taste or smell anymore. Those aren't things that you need an expert to come in and testify to. That's something that the victim lives with each and every day, and he knows better than anyone the injuries that he sustained in this case.

So I don't think in anyway that requires the doctor to come in and testify to.

[DEFENSE COUNSEL]: Well, just . . . two specifics in reply—

THE COURT: Okay.

DEFENSE COUNSEL: —and then we can get out of this issue. There's an indication from the medical records that there was no fracture and there's indication from the medical records that there was no sensory deprivation.

THE COURT: Okay.

[DEFENSE COUNSEL]: You know, those are the—

[THE STATE]: Judge, if I can make one more thing clear on the record?

THE COURT: Sure.

[THE STATE]: That could be presented in their case. Mr. Rodney waived all rights to any experts in this case. That's why we're here on this trial on this date because at calendar call when they had just received the medical records, [counsel for co-defendant Downing] asked for a continuance to get an expert, to talk about these records, and on the record, Judge Villani made very clear to Mr. Rodney that at this point exactly what could happen and [defense counsel] couldn't get in the experts, and Mr. Rodney said on the record, "I waive my right to any experts."

THE COURT: All right. Here's the—working backwards through what [defense counsel] first brought up, I mean, I agree that it would be absolutely futile to make any motion to strike anything related to substantial bodily harm, but they're separate and apart from what any doctor would testify to, substantial bodily harm still involves prolonged physical pain and involves physical disfigurement or—or loss of—of a limb or organ or other claims which would include your senses, and

no one's in a better position to testify to the loss of sensory deprivation than the actual person suffering [sic] from it.

I mean, you can have an expert, if you wanted to come in and test those things, but really it's just testimony from the victim about the fact that he can't taste anything anymore and he can't smell anymore.

More importantly, there are a number of scars that were left on this gentleman's head in relation to the beating that he took. Those things coupled with the pain aspect there is overwhelming evidence from which a jury can find regardless of who did it based separate to [sic] bodily harm. So that—that's one thring [sic], bup [sic] separate and apart from that, the lack of an objection, the lack of an untimely [sic] objection at the time that the gentleman is describing what occurred to him, prohibits me from addressing it to the jury and—and forecloses the State's ability to respond to that objection by establishing more foundation that they need to to get those things in. You know, contrary to, you know, what the belief is, victims are certainly entitled to testify as lay people to a number of types of injuries that they've suffered. Broken bones, things like that. A lay person can look at her arm bent off in a ninety-degree angle just like anybody else and say, "I got a broken arm." Don't need a doctor to do that.

Lay people can testify about their prolonged physical pain. They can testify about scaring [sic]. They can testify about bleeding. They can testify about the loss o[f] sensory deprivation [sic]. The loss of a use of a limb. Whatever it maybe [sic].

There are some things that are within the full, you know, authority of a doctor to testify about, but I don't know that anything Mr. Monko testified about maybe [sic] safe [sic] except for the fact that he had an infection would really need to be from testifying of a doctor, and since there was no objection at the time, I'm certainly not going to strike it now.

(ECF No. 15-15 at 41–46.)[17]

### 6.  Closing Arguments

In closing remarks to the jury, the State argued it proved Rodney had intent to kill based on (1) his "case-targeting" and pursuit of Monko at Hard Rock as evidenced by the video and his befriending him and giving a false name; (2) his pursuit of Monko after they left Hard Rock by calling him that night and offering to meet him to sell him drugs; (3) the intentional and immediate use of the bat that Downing had hidden up his sleeve, which indicated they had a plan from the start; (4) the scar and injuries on Monko's head that indicate a knife was intentionally used very close to his eye; (5) that they pulled back his hair and told him "Now, you're a dead man[;]" (6) the seriousness of the injuries to Monko's head as evidenced by the photographs taken of Monko at the hospital and his testimony about "how much pain" he had; and (7) they left him "for dead"

---

[17] Respondents confirmed the trial transcript of opening remarks is unavailable. (ECF No. 103.)

lying unconscious in his own blood. (ECF No. 15-17 at 16–21, 26–36.)

In the defense closing remarks, trial counsel argued Monko admitted he perjured himself at the preliminary hearing and pointed out that the trial court instructed the jury it could consider disregarding the entire testimony of a witness who is untruthful about some things. (*Id.* at 37–39.) Counsel argued the jury had to find Rodney wanted to kill Monko as distinguished from wanting to beat him until he was able to take Monko's money. (*Id.*) Counsel conceded, "We know Mr. Monko's badly beaten. We know that is true. He even talked, "Look I got brain injuries. I had a short-term memory loss." (*Id.* at 40.) However, counsel also pointed out that although Monko testified that he was in the hospital for a "long time, like days," Detective Condradovich testified Monko was released after about 3 hours and the detective was still processing the scene when Monko returned home. (*Id.* at 39.) Counsel argued the police did not find Rodney's fingerprints or DNA at the scene or in Ishol's truck, and they found no fibers, no bat, no knife, and no cell phone. (*Id.* at 42.) Counsel argued Rodney's brother testified Rodney was sick and asleep at the time of the offenses. (*Id.* at 42–43.)

In rebuttal, the State argued the case was not a "Who done it," there was no mistaken identification, Rodney demonstrated his intent because he invited Downing "into the mix" after seeing the opportunity at Hard Rock, and Downing brought the bat up his sleeve. (ECF Nos. 15-17 at 44–51; 15-18 at 17, 25.) The State argued there was evidence a knife was used because the EMS technician and Carroll each testified Monko had lacerations on his head and the 9-1-1 call demonstrated Carroll told the 9-1-1 dispatch that Monko's lacerations looked like he was cut with a knife. (ECF No. 15-18 at 22.) The State argued, "[Monko] told you even after the knife strike, he was down on the ground, he'd been kicked in the ribs, he'd been beaten with a bat, and he feels his head being pulled back and hears, "You're dead now." (*Id.* at 18–19.) The State argued Monko testified one of the men "put a knife into [his] eye," that Monko suffered "facial fractures," lost his smell and taste, and was readmitted to the hospital for 5 to 7 days. (*Id.* at 18–21.)

### C.    Procedural Default Analysis for Grounds 3 and 9

The remand order directs the Court to consider whether Rodney can overcome his procedurally defaulted IAC claims that counsel failed to (1) investigate or challenge the

prosecution's medical evidence at trial, (2) timely object to Monko's lay medical testimony about his medical diagnoses, (3) use medical records to impeach Monko's medical testimony, and (4) call medical experts or treating medical providers to testify regarding Monko's injuries. (ECF No. 57 at 10.) Rodney's *pro se* Petition alleges counsel's ineffective assistance was prejudicial as to his conviction for attempted murder with a deadly weapon. (ECF No. 102 at 9–12, 27–30.) The remand order states the "severity of Monko's injuries was potentially relevant to elements of several of the charges of which Rodney was convicted." (ECF No. 57 at 11.) "Prisoner *pro se* pleadings are given the benefit of liberal construction." *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)) ("A document filed pro se is to be liberally construed."). As the parties addressed Rodney's claims for purposes of his convictions for battery with a deadly weapon resulting in substantial bodily harm, attempted murder with a deadly weapon, and conspiracy to commit murder, the Court will consider the substantiality of the IAC claims as to those three convictions. For the reasons discussed below, the Court finds Rodney fails to establish a substantial claim of ineffective assistance of trial counsel necessary to overcome the procedural default of his claims for the relevant convictions because there is no merit to his claim that counsel's actions prejudiced him under *Strickland*.

### 1.   Battery with Use of a Deadly Weapon Resulting in Substantial Bodily Harm

Rodney was charged with battery with use of a deadly weapon resulting in substantial bodily harm under three theories of culpability: (1) by directly committing the crime; (2) conspiracy with Downing, including with specific intent to commit this offense; or (3) by aiding or abetting in the commission of the crime by accompanying Downing to the crime scene where he acted as lookout for himself and Downing, he displayed a bat and/or knife and Downing displayed a bat and/or knife, he and Downing both struck Monko about the head and body and took lawful money of the United States, a wallet and contents, keys, and a cellular telephone from the person and/or presence of Monko, he and Downing left the crime scene together with the property taken from Monko, he and Downing encouraged one another throughout by actions and words and acted in concert throughout. (ECF No. 15-20 at 5–6.)

At the relevant time in Nevada, "battery" meant "any willful and unlawful use of force or violence upon the person of another." NRS § 200.481.1(a), *as amended by* Laws 2009, c. 42 § 3, eff. May 6, 2009. A battery committed with the use of a deadly weapon that causes the victim substantial bodily harm is punished more severely than a simple battery. NRS § 200.481.2(e)(2), *as amended by* Laws 2009, c. 42 § 3, eff. May 6, 2009. "Substantial bodily harm" means: (1) bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ; or (2) prolonged physical pain. NRS § 0.060. According to the Nevada Supreme Court, "the phrase 'prolonged physical pain' must necessarily encompass some physical suffering or injury that lasts longer than the pain immediately resulting from the wrongful act." *Collins v. State*, 125 Nev. 60, 64–65, 203 P.2d 90, 92–93 (2009). In *Collins,* the Supreme Court of Nevada explained: "In a battery, for example, the wrongdoer would not be liable for 'prolonged physical pain' for the touching itself . . . [but] the wrongdoer would be liable for any lasting physical pain resulting from the touching." *Id.* at n.3.

"Nevada law does not distinguish between an aider and abettor to a crime and an actual perpetrator of a crime: both are equally culpable" provided the aider or abettor "knowingly aided the other person with the intent that the other person" commit the charged crime. *Sharma v. State*, 118 Nev. 648, 654, 56 P.3d 868, 871–72 (2002). "A conspiracy is an agreement between two or more persons for an unlawful purpose." *Doyle v. State,* 112 Nev. 879, 894, 921 P.2d 901, 911 (1996), *overruled on other grounds by Kaczmarek v. State,* 120 Nev. 314, 333, 91 P.3d 16, 29 (2004). "A person who knowingly does any act to further the object of a conspiracy, or otherwise participates therein, is criminally liable as a conspirator . . . ." *Id.* "Conspiracy is seldom susceptible of direct proof and is usually established by inference from the conduct of the parties." *Thomas v. State*, 114 Nev. 1127, 1143, 967 P.2d 1111, 1122 (1998). Evidence of "a coordinated series of acts furthering the underlying offense" is "sufficient to infer the existence of an agreement" to support a conspiracy conviction. *Id.* Absent an agreement to cooperate in achieving the purpose of a conspiracy, mere knowledge of, acquiescence in, or approval of that purpose does not make one a party to conspiracy. *Doyle*, 112 Nev. at 894, 921 P.2d at 911. "[A] defendant may not be held

criminally liable for the specific intent crime committed by a coconspirator simply because that crime was a natural and probable consequence of the object of the conspiracy;" rather, "the State must show that the defendant actually possessed the requisite statutory intent." *Bolden v. State*, 121 Nev. 908, 922, 124 P.3d 191, 200–01 (2005). Conspiracy is a specific intent crime. *See Nelson v. State*, 123 Nev. 534, 549, 170 P.3d 517, 527 (2007) (noting that robbery is a general intent crime while conspiracy to commit robbery is a specific intent crime).

Rodney's IAC claims for his conviction for battery with a deadly weapon resulting in substantial bodily harm are insubstantial because they lack merit. Counsel's performance caused Rodney no prejudice under *Strickland* because the State presented irrefutable evidence that Monko was battered with a deadly weapon (a bat, another object, and a knife), and that Monko experienced, at the very least, "prolonged physical pain." Monko and Womack testified Monko was hit multiple times with a bat. Monko said he was hit both by Downing and Rodney. Womack did not see Rodney hit Monko, but she did not see the entirety of Rodney's actions because she turned away. Monko said a knife was used to cut his forehead and an instrument was used to cut the back of his head. Womack testified Rodney and Downing were working together and they left Monko lying unconscious. Carroll found Monko bleeding from his head several hours after the beating and Downey and Carroll testified Monko had lacerations on his head and the photographs of Monko's injuries depict the same. Carroll testified Monko was in pain when he returned home from the hospital and Reilly testified he visited Monko about the time the stitches were removed from Monko's head and witnessed Monko's inability to taste and smell, as well as his seizures. Monko showed the jury the scar from his eyebrow up to his hairline on his forehead and explained he had symptoms long after the beating including headaches and dizziness and that he consulted multiple physicians apart from his visits to Sunrise Hospital. Had trial counsel timely objected to Monko's testimony that he suffered post-traumatic stress disorder, brain damage, severed nerves, and an infection, and had that testimony been stricken without a response from the State with evidence to support the claims, there is no reasonable probability the result of the proceedings would have been different. The evidence of "prolonged physical pain" was irrefutable. Had counsel elicited Monko's admission that his emergency room records indicated he had no "sensory

deprivation" or "numbness," or that Monko had previously exaggerated the number of stitches he received or exaggerated his injuries and medical assistance, such impeachment could not refute the overwhelming evidence that Rodney battered Monko using a deadly weapon that resulted in substantial bodily harm. Rodney therefore fails to establish there is any merit to his claims of *Strickland* prejudice. As such, he cannot overcome the procedural default of his IAC claims for his conviction for battery with the use of a deadly weapon resulting in substantial bodily harm and *Martinez*, and the claims will be dismissed.

### 2. Attempted Murder with a Deadly Weapon and Conspiracy to Commit Murder

Rodney was charged with attempted murder under three theories of culpability: (1) by directly committing the crime; (2) conspiracy with Downing, including with specific intent to kill Monko; or (3) aiding or abetting in the commission of the crime by accompanying, encouraging, and acting in concert with Downing. (ECF No. 15-20 at 4–5.) "[A]ttempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill." *Valdez v. State*, 124 Nev. 1172, 1197, 196 P.3d 465, 481 (2008) (citations in footnote omitted). "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." NRS § 200.020(1). "Intention is manifested by the circumstances connected with the perpetration of the offense, and the sound mind and discretion of the person accused." NRS § 193.200. "Thus, 'intent can rarely be proven by direct evidence of a defendant's state of mind, but instead is inferred by the jury from the individualized, external circumstances of the crime.'" *Valdez*, 124 Nev. at 1197, 196 P.3d at 481 (citation in footnote omitted). A jury may "infer intent to kill from the manner of the defendant's use of a deadly weapon." *Id.* (citation in footnote omitted). Rodney was also charged with conspiracy to commit murder. (ECF No. 15-20 at 4.)

Rodney contends counsel was ineffective in failing to investigate and challenge the medical evidence, timely object to Monko's testimony about his medical diagnoses, impeach Monko with his medical records, and call an expert to explain Monko's injuries, because he claims that

Monko's injuries were critical to the jury's determination and constituted the "only true evidence presented by the prosecution to allege" whether he had the requisite specific intent to kill. (ECF No. 102 at 10.) However, the state court record demonstrates the State prosecutors did not at all rely upon Monko's trial testimony about his medical diagnoses or the alleged exaggerations concerning the nature and extent of the injuries he suffered from the attack in establishing that it proved the requisite intent to kill. The State did not at all rely on Monko's medical records or the testimony of a treating physician, nurse, or medical expert. Instead, in closing and rebuttal argument, the State argued it proved Rodney had the requisite intent to kill Monko based on (1) Rodney's "case-targeting" and pursuit of Monko at Hard Rock as evidenced by his actions portrayed in the video surveillance; (2) his pursuit of Monko after they left Hard Rock; (3) the intentional and immediate use of the bat which Downing had hidden up his sleeve; (4) the testimony of the EMS technician and Carroll about the lacerations on Monko's head and Carroll's statement that it looked like he was cut with a knife; (5) the scar and injuries on Monko's head that indicate a knife was intentionally used very close to his eye; (6) Monko's testimony that they told him "Now, you're a dead man," (7) the seriousness of the injuries to Monko's head as depicted in the photographs taken of Monko at the hospital; and (8) that Rodney and Downing left Monko lying unconscious in his own blood. (ECF No. 15-17 at 16–21, 26, 28–30, 34, 36.)

It is true that nothing in the reviewable emergency room medical records from Sunrise Hospital states that Monko suffered nerve damage, seizures, post-traumatic stress disorder, brain damage, water in his knees, infection, numbness of his face, or loss of taste and smell. There is also nothing in the record demonstrating he was qualified to provide testimony about his medical diagnoses. The State, however, did not rely upon any of the testimony about those conditions or diagnoses to prove Rodney had the intent to kill. Thus, even if trial counsel had investigated and challenged the medical evidence, timely objected to Monko's testimony about his medical diagnoses and that testimony had been stricken, and used the reviewable medical records to impeach Monko about inconsistencies in his trial and preliminary hearing testimony and his emergency room records, there is no reasonable probability the result of the proceedings would have been different as to the convictions for attempted murder with use of a deadly weapon and

conspiracy to commit murder. Likewise, given that Rodney failed to develop any evidence to support his claim that counsel was ineffective in failing to call a medical expert, there is no factual basis to support a substantial claim of ineffective assistance of counsel for failure to do so. Accordingly, Rodney cannot establish a substantial claim that trial counsel provided prejudicial ineffective assistance under *Strickland* and *Martinez*, for purposes of setting aside the procedural default of this claim, and the claims will be dismissed.

## V.   CERTIFICATE OF APPEALABILITY

This is a final order adverse to Rodney. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This Court therefore has *sua sponte* evaluated the claims within the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). When a district court denies relief on procedural grounds, the petitioner seeking a COA must show both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Gonzalez v. Thaler*, 565 U.S. 134, 140–41 (2012); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Applying this standard, the Court will issue a certificate of appealability because it finds that Grounds 3 and 9 of the Petition state a valid claim of the denial of a constitutional right and jurists of reason could find it debatable whether the Court is correct in its procedural rulings on the following issues:

1.   Whether the Court may consider documents that Rodney failed to develop in the state court proceedings or conduct an evidentiary hearing for purposes of determining whether Rodney can overcome the procedural default of his IAC claims in accordance with *Shinn* and 28 U.S.C. § 2254(e)(2); and

2.   Whether Rodney has failed to state a substantial IAC claim for purposes of overcoming the procedural default of those claims, as to his convictions for attempted murder with a deadly weapon and conspiracy to commit murder, under *Martinez* and *Shinn*.

The Court finds a certificate of appealability is not warranted for the Court's assessment that Rodney cannot overcome the procedural default of his IAC claims for his conviction for battery

with use of a deadly weapon resulting in substantial bodily harm because reasonable jurists would not find the Court's procedural ruling debatable or wrong.

## VI.    CONCLUSION

**IT IS THEREFORE ORDERED:**

1. Grounds 3 and 9 of the Petition (ECF No. 102) are dismissed with prejudice as procedurally defaulted and the Petition (ECF No. 102) is DENIED with prejudice.

2. Certificates of appealability are GRANTED as discussed in this Order for Grounds 3 and 9 of the Petition as they relate to Rodney's convictions for attempted murder with a deadly weapon and conspiracy to commit murder;

3. A certificate of appealability is DENIED as discussed in this Order as to Rodney's conviction for battery with use of a deadly weapon resulting in substantial bodily harm;

4. All requests for an evidentiary hearing are DENIED;

5. The Clerk of Court is directed to substitute Tim Garrett for Respondent Warden Baker; and

6. The Clerk of the Court is directed to enter judgment accordingly and close this case.

DATED this _____ 29th _____ day of _____ March _____ 2023.

ROBERT C. JONES
UNITED STATES DISTRICT JUDGE